**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| Helga Cohen, Steven Cohen, Lisa Echols, Robert Echols, Jr., Melissa Fritz, Wayne Fritz, Alexander Giles, Carolyn Giles, Aimee Gondi, Gokul Gondi, Denise Hubbard, Charles Hubbard, Christopher Long, Leslie Long, Jane Marshall, Christopher Marshall, Joseph Park, Sohee Park, John Parrott, Krista Parrott, Jesse Myers, Jacqueline Myers, Kim Rich, Smythe Rich, and Donna Strom, | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No.: 3:16-cv-01489-JMC |
| Plaintiffs, | ) ) | |
| v. | ) ) | **ORDER** |
| United States of America, | ) ) | |
| Defendant. | ) ) ) | |
| Martha Brown, Frank Brown, Jennifer Feldman, Barry Feldman, John Babson, Steve Cloud, Laura Cloud, and Elizabeth Brogdon, | ) ) ) ) ) | Civil Action No.: 3:16-cv-03053-JMC |
| Plaintiffs, | ) ) | **ORDER** |
| v. | ) ) | |
| United States of America, | ) ) | |
| Defendant. | ) ) ) | |
| Kings Grant Owners' Association, Inc., | ) ) | Civil Action No.: 3:17-cv-00289-JMC |
| Plaintiff, | ) ) | **ORDER** |
| v. | ) ) | |
| United States of America, | ) ) | |
| Defendant. | ) ) ) | |

Plaintiffs above-named collectively filed these related actions seeking money damages

from Defendant United States of America (the "Government") for the destruction caused to their

1

homes by flood water freed when it breached the Semmes Lake Dam and the Lower Legion Lake Dam[1] at Fort Jackson (South Carolina) army installation in October 2015.  *See Cohen v. United States*, C/A No. 3:16-cv-01489-JMC, ECF No. 1 (D.S.C. May 9, 2016) ("*Cohen*"); *Brown v. United States*, C/A No. 3:16-cv-03053-JMC, ECF No. 1 (D.S.C. Sept. 8, 2016) ("*Brown*"); and *Kings Grant Owners Ass'n, Inc. v. United States*, C/A No. 3:17-cv-00289-JMC, ECF No. 1 (D.S.C. Jan. 31, 2017) ("*KGOAI*").

This matter is before the court pursuant to the parties' cross dispositive motions. Specifically, Plaintiffs move for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the issue of liability as it relates to their cause of action for negligence.  (ECF No. 103 (*Cohen*); ECF No. 46 (*Brown*); ECF No. 56 (*KGOAI*).)  In addition, the Government moves the court to dismiss these actions under Rule 12(b)(1) for lack of subject matter jurisdiction based on the discretionary function exception, *see* 28 U.S.C. § 2680(a), to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680, or, in the alternative, for partial summary judgment pursuant to Rule 56 on Plaintiffs' claims related to the Lower Legion Lake Dam and for trespass and nuisance.  (ECF No. 140 (*Cohen*); ECF No. 82 (*Brown*); ECF No. 73 (*KGOAI*).[2])  The parties oppose each other's Motions respectively.  (ECF Nos. 126, 152 (*Cohen*); ECF Nos. 69, 94 (*Brown*); ECF Nos. 60, 86 (*KGOAI*).[3])  For the reasons set forth below, the court **GRANTS** the Government's Motion to Dismiss.

---

[1] The Lower Legion Lake Dam is sometimes referred to as a dike.  (*See, e.g.*, ECF No. 1 at 9 ¶ 56 (*Cohen*).)

[2] The court observes that Plaintiffs filed the same brief in the *Cohen* and *Brown* actions in support of their Motion.  Moreover, in *KGOAI*, Plaintiff expressly joined and incorporated "fully herein by reference all arguments, law and evidence cited and included in" that brief.  (*See* ECF No. 56 at 1 (*KGOAI*).)  In addition, the Government filed the same brief in all three actions to support its Motion.  Accordingly, to conserve space, the court will only cite hereinafter to the briefs filed in *Cohen*.

[3] The court observes that Plaintiffs filed the same opposition brief in the *Cohen* and *Brown* actions.  Moreover, in *KGOAI*, Plaintiff expressly joined and incorporated "fully herein by

# I.    RELEVANT BACKGROUND TO PENDING MOTIONS

Fort Jackson spans 52,000 acres and serves "as the U.S. Army's main production center for Basic Combat Training."  *U.S. Army Training Center, Fort Jackson*, http://jackson.armylive. dodlive.mil/about/ (last visited Sept. 18, 2018).  The individual Plaintiffs in *Cohen* and *Brown* "are all owners of real and/or personal property in Kings Grant, a subdivision located in Columbia, South Carolina, which abuts Fort Jackson."  (ECF No. 48 at 4 ¶ 21 (*Cohen*); ECF No. 1 at 3 ¶ 13 (*Brown*).)  Plaintiff in *KGOAI* maintains and manages "the common areas of King's Grant."  (ECF No. 1 at 2 ¶ 9 (*KGOAI*).)  Semmes Lake and Lower Legion Lake are bodies of water "located completely within the boundaries of Fort Jackson's Military Reservation and, as such, are owned by the Federal Government."  *Environmental Assessment: Replacement of Semmes Lake Dam*, http://www.sac.usace.army.mil/Portals/43/docs/milcon/Semmes%20Lake% 20 Draft %20EA.pdf?ver=2017-08-11-152050-713 (last visited Sept. 19, 2018); *Environmental Assessment: Upper and Lower Legion Lakes Repairs*, http://www.sac.usace.army.mil/Portals/43 /docs/milcon/Final%20Legion%20Lakes%20EA.pdf?ver=2017-08-31-145359-603  (last visited Sept. 25, 2018).

The Semmes Lake Dam is an earthen dam that impounds the waters from the Semmes Lake.  *Id.*; (*see also* ECF No. 114 at 21).  "The Semmes Lake Dam was reportedly constructed in the 1930s by National Guard personnel to provide recreation for the installation."  (ECF No. 114 at 11.)  "Semmes Lake Dam is located near the southern boundary of the Fort Jackson Reservation limits on Wildcat Creek."  (ECF No. 103-11 at 4.)  "The structural height [of the Semmes Lake Dam] is 27 f[ee]t, [] the crest length is 970 f[ee]t[ , . . . and] [t]he normal reservoir

---

reference all arguments, law and evidence cited and included in" that brief.  (*See* ECF No. 86 at 1 (*KGOAI*).)  Additionally, the Government filed the same opposition brief in all three actions. Accordingly, to conserve space, the court will only cite hereinafter to the briefs filed in *Cohen*.

capacity is 329 acre-f[ee]t." (ECF No. 103-15 at 6.)

The Lower Legion Dam is an earthen dam that impounds the waters from the Lower Legion Lake. (ECF No. 114-1 at 5); *see also Environmental Assessment: Upper and Lower Legion Lakes Repairs*, http://www.sac.usace.army.mil/Portals/43/docs/milcon/Final %20Legion %20Lakes%20EA.pdf?ver=2017-08-31-145359-603 (last visited Sept. 25, 2018). "The Lower Legion Lake Dam . . . was constructed in the late 1950s to supply water to the Fort Jackson golf course." (ECF No. 114 at 11.) The "Lower Legion Lake Dam is located on a tributary to Wildcat Creek within Fort Jackson." (ECF No. 114-1 at 5.) However, Fort Jackson generally does not consider the Lower Legion Lake Dam to be an actual dam.[4] (*Id.* at 15.) The structural height of the Lower Legion Lake Dam is 12 feet, the crest length is 500 feet, and the normal reservoir capacity is 37 acre-feet. (ECF No. 114-1 at 8–9.)

In September 1997, the Savannah District Army Corps of Engineers drafted an Emergency Action Plan ("EAP") for the Semmes Lake Dam. (ECF No. 103-11.) The EAP was deemed necessary because the Semmes Lake Dam had a hazard classification of "significant, meaning the failure of the dam would likely not cause loss of life but could cause appreciable economic loss." (*Id.* at 4 ("State and federal guidelines . . . dictate that dams with high hazard classifications should have Emergency Action Plans.").) In the EAP, the Corps of Engineers observed:

> The Phase I inspection report of Semmes Lake concluded that Semmes Lake Dam was 'small' size, based on dam height and storage volume, and 'high hazard, based on downstream development in the flood plain. However, the Phase II inspection conducted by the U.S. Army Corps of Engineers, Savannah District,

---

[4] AR 420-1 defines a dam as "any artificial barrier, including appurtenant works, which impounds or diverts water, and which is either—(1) Twenty-five feet or more in height from the natural bed of the stream or watercourse measured at the downstream toe of the barrier or from the lowest elevation of the outside limit of the barrier if it is not across a stream channel or watercourse, to the maximum water storage elevation. (2) Has an impounding capacity at maximum water storage elevation of 50 acre feet or more." (ECF No. 103-3 at 4–5 § 7-45.)

resulted in the hazard classification being changed to significant because the threat of loss of life is low. The significant hazard classification is supported by the flood hazard analysis performed for this plan. The appropriate Spillway Design Flood[5] (SDF) was determined to be ½ the PMF.[6]

(*Id.* at 9.) The Corps of Engineers further determined that "[t]he existing spillway is adequate to pass only about 25 percent of the PMF (10.8 inches of rain in 24 hours) and should be upgraded." (*Id.* at 11.)

On May 1, 2000, the Department of the Army ("DA") published AR 420-72 (effective June 1, 2000), which established among other things that: (1) Army dams are classified "according to their size and hazard potential"; (2) "Army dams at all CONUS[7] installations will be maintained at or above the minimum condition levels of host State and as specified herein and in the above referenced FEMA[8] documents"; (3) "[a]ll dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability"; (4) "[f]inal decision responsibility on the design flood/risk analysis shall be the decision of the dam owner, the installation commander"; and (5) an EAP "shall be prepared for each high and significant hazard installation dam." (ECF

---

[5] According to Plaintiffs' expert Dr. W. Allan Marr, "[t]he design flood of any dam is the flow rate and volume at which the dam must be maintained to allow passage of the design flows (flood) without major deterioration of dam components, damaging erosive undermining action, or loss of stability." (ECF No. 126-6 at 2.) "The selection of the design flood should be based on an evaluation of the relative risks and consequences of flooding, under both present and future conditions." (*Id.*)

[6] "PMF" is Probable Maximum Flood, which "means the largest flood that theoretically could occur at a given site during our present geological and climatic era." S.C. Code Ann. Regs. 72-1(R) (2012). "The initiating event in a PMF determination is the PMP." *Id.* "'Probable Maximum Precipitation' (PMP) means the theoretically greatest-depth of precipitation for a given duration that is physically possible over a given area at a given time of year; these projected maximum precipitation numbers are arrived at by the National Weather Service by studying actual storm events that have occurred in similar climatic areas." *Id.* 72-1(Q). "The 50 percent of PMF flood simulated represents 18.8 inches of rain over 24 hours, 6.5 inches during the maximum hour." (ECF No. 103-11 at 11.)

[7] "CONUS" means the Continental United States. (ECF No. 152 at 11 n.7.)

[8] "FEMA" is the acronym for the Federal Emergency Management Agency.

No. 103-4 at 4 § 5-3; 5 §§ 5-5, 5-6; 7 § 5-15.)

Between October 16, 2006, and March 31, 2008, the "Semmes Lake Dam and its spillway underwent major repairs and alterations." (ECF Nos. 113 at 16, 114-6 at 19.) The following safety modifications were made to the dam: "Remove existing primary spillway (outlet works) inlet structure, 24-inch diameter conduit, and dissipation basin[;] Construct a new primary spillway (outlet works) inlet structure, 48-inch diameter conduit, and dissipation basin; Excavate approximately 1/5 of the dam embankment to replace the primary spillway and reconstruct embankment[][;] Armor the upstream slope of the dam embankment with riprap stone[][; and] Remove the emergency spillway chute, and construct a new concrete spillway chute and plunge pool." (ECF No. 114-6 at 19.)

On February 12, 2008, the Department of the Army published AR 420-1 (effective February 19, 2008), which established among other things that: (1) "[c]lassification of each installation's dams shall be reviewed and validated every 2 years by the garrison commander"; (2) "Army dams will be maintained at or above the minimum condition levels of host state or host nation and as specified herein"; (3) "[a]ll dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability"; (4) "[f]inal decision responsibility on the design flood and risk analysis shall be the decision of the dam owner, the garrison commander"; (5) "[t]he garrison commander shall ensure that an EAP is prepared for each high and significant hazard installation dam"; and (6) "[i]In providing . . . dam safety services, Army garrisons will comply with all applicable Federal laws and regulations." (ECF No. 103-3 at 5 §§ 7-46, 7-47; 6 § 7-54; ECF No. 126-2 at 9 § 7-5(a).)

On April 9, 2009, the DA published DA Pamphlet 420-1-3 to provide "guidance for

project planning and execution, maintenance, repair, minor construction, and control of . . . dams." (ECF No. 103-9.) Regarding dam maintenance, Pamphlet 420-1-3 advised that:

> A good maintenance program will protect a dam against deterioration and prolong its life. A poorly maintained dam will deteriorate and can fail. Nearly all the components of a dam and the materials used for dam construction are susceptible to damaging deterioration if not properly maintained. A good maintenance program provides not only protection for the owner, but for the general public as well. Furthermore, the cost of a proper maintenance program is small compared to the cost of major repairs or the loss of life and property or potential liability for such losses. A garrison commander should develop a basic maintenance program based primarily on systematic and frequent inspections. . . . Safety deficiencies must be addressed immediately by either lowering the pool or correcting the deficiency. Garrison commanders may be held personally liable for the safety of the dams under their authority and must fund projects to correct the deficiencies . . . . Earthen dams will have vegetation properly controlled and mowed, seepage will be constantly observed and controlled, and erosion repaired. Spillways will be properly maintained and erosion repaired. Outlets will be maintained and controls tested annually.

(ECF No. 103-9 at 7 § 6-4.)

On November 16, 2009, Corps of Engineers personnel inspected the Semmes Lake Dam and determined that the dam was in fair condition, but recommended the removal of specified shrubbery, vegetation, trees, and stumps. (ECF No. 103-15 at 6.)

In June of 2010, the Corps of Engineers prepared another EAP for the Semmes Lake Dam. Because it determined that the dam's hazard classification was again "significant," the Corp of Engineers made the following observations in the EAP:

> One half of the Probable Maximum Precipitation (PMP) is the required design storm under the South Carolina Rules for Dam Safety for Semmes Lake Dam. This is based on the significant hazard classification of the dam. Significant hazard dams are described as any dam where there is no probable loss of human life, but a possible economic loss, environmental change, or disruption of lifeline facilities. There is potential hazard to the commercial offices along Marion Ave as well as several houses along N. Kings Grant Dr. Semmes Lake Dam is classified as a small dam, with 329 acre-feet of normal pool storage, 970 feet long, and 27 feet in height.

(ECF No. 103-12 at 8.)

During a four day period from October 2–5, 2015, a historic storm event occurred across South Carolina causing "rainfall totals in the Columbia area [to] exceed[] the 1,000-year recurrence intervals as referenced to the point precipitation frequency estimates in NOAA Atlas 14[9] (CISA, 2015)." *Environment Assessment: Replacement of Semmes Lake Dam*, http://www.sac.usace.army.mil/Portals/43/docs/milcon/Semmes%20Lake%20Draft%20EA.pdf?ver=2017-08-11-152050-713 (last visited Sept. 17, 2018). "Two rainfall gauges on the Fort . . . recorded a maximum 24-hour rainfall of 13.4 inches from 8 pm on 3 October 2015 to 8 pm on 4 October 2015 from the storm event." (ECF No. 114 at 13.) The flooding caused by the historic storm event breached both the Semmes Lake Dam and the Lower Legion Lake Dam. (*Id.* at 11–12.)

On October 21, 2015, Fort Jackson contacted the Corps of Engineers Risk Management Center ("RMC") seeking an independent assessment "regarding the failure of Semmes Lake Dam, Lower Legion Dam, . . . following the extreme storm event that occurred on 4 October 2015." (ECF No. 114 at 17.) On August 26, 2016, the RMC produced a document titled October 2015 Storm Event Independent Technical Review ("ITR"). (ECF Nos. 114–114-20.) In the ITR, the RMC expressly observed that the maximum rainfall record was 13.4 inches in 24-hours and both the Semmes Lake Dam and Lower Legion Lake Dam failed because of overtopping.[10] (ECF No. 114 at 13, 15.) In addition, the RMC observed that (1) "Semmes Lake Dam was not managed in accordance with Army regulation and guidance for dams (including

---

[9] "NOAA" is the acronym for the National Oceanic and Atmospheric Administration. The "NOAA Atlas 14" is "intended as the official documentation of precipitation frequency estimates and associated information for the United States." *NOAA Atlas 14*, https://www.nws.noaa.gov%2Foh%2Fhdsc%2FPF_documents%2FAtlas14_Volume1.pdf&usg=AOvVaw2DQBGo3Vs317O8rFkUZsrp (last visited Sept. 27, 2018).

[10] "Overtopping" is "[a] condition that occurs when the elevation of the still-water level and/or associated waves, wind setup, or surge exceeds the top of the dam or levee system." *Guidance for Emergency Action Plans, Incident Management and Reporting, and Inundation Maps for Dams and Levee Systems*, https://www.publications.usace.army.mil/LinkClick.aspx?fileticket=wPpTpqGfUYQ%3D&tabid=16426&portalid=76&mid=31387 (last visited Sept. 25, 2018).

AR 420-1 and DA Pam 420-1-3) that address inspection, maintenance, safety, and performance";
(2) "DHEC[11] regulations expressly exempt dams owned or operated by an agency of the Federal
government"; (3) "the dam could not pass 50% of the PMF without overtopping"; and (4)
"Lower Legion Lake Dam likely would have overtopped for the 4 October 2015 storm event
regardless if it met the hydrologic requirements for its size and hazard category." (ECF No. 114
at 13–15.)

Because they believe damage to their real and personal property occurred as a result of
"the failure of the Semmes Lake [D]am and Lower Legion Lake [D]ike" (*see* ECF No. 48 at 11 ¶
77, 12–13 ¶ 90 (*Cohen*); ECF No. 1 at 8 ¶ 53 (*Brown*); ECF No. 1 at 5 ¶ 33 (*KGOAI*)), Plaintiffs
filed Complaints against the Government for negligence in *Cohen* on May 9, 2016, in *Brown* on
September 8, 2016, and in *KGOAI* on January 31, 2017. (ECF No. 1 at 10 ¶ 65–12 ¶ 76; ECF
No. 1 at 8 ¶ 56–11 ¶ 67 (*Brown*); ECF No. 1 at 5 ¶ 35–7 ¶ 46(*KGOAI*).) After the court entered
an Order in *Cohen* granting their Motion to Amend the Complaint (ECF Nos. 40, 47 (*Cohen*)),
those Plaintiffs filed an Amended Complaint alleging claims for negligence, trespass, and
nuisance. (ECF No. 48 at 11 ¶ 82–16 ¶ 113 (*Cohen*).) After the parties conducted extensive
discovery, Plaintiffs filed their Motion on March 13 and April 20, 2018, and the Government
filed its Motion on June 15, 2018. (ECF Nos. 103, 140.) Plaintiffs filed opposition to the
Government's Motion on July 26, 2018, and the Government filed opposition to Plaintiffs'
Motion on May 11, 2018. (ECF Nos. 126, 152.)

On September 21, 2018, the court heard argument from the parties on the pending
Motions. (ECF No. 180 (*Cohen*); ECF No. 125 (*Brown*); ECF No. 111 (*KGOAI*).)

## II.     JURISDICTION

The court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. §

---

[11] "DHEC" refers to the South Carolina Department of Health and Environmental Control.

1346(b)(1), which grants district courts original jurisdiction over civil actions against the Government including those brought under the FTCA wherein the Government can be found "liable to a tort claimant to the same extent that a private person would be liable according to the law of the state of the occurrence." *Juaire v. United States*, No. 4:09-cv-709-TLW, 2012 WL 527598, at *10 (D.S.C. Feb. 16, 2012) (citing 28 U.S.C. § 1346(b) and § 2674).

## III. LEGAL STANDARD

### A. Motions to Dismiss for Lack of Subject Matter Jurisdiction

A Rule 12(b)(1) motion for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick, Md.*, 191 F.3d 394, 399 (4th Cir. 1999). In determining whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Id.* (citation omitted).

As a sovereign, the Government is immune from suit unless it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). The Government may define the terms and conditions upon which it can be sued. *Soriano v. United States*, 352 U.S. 270, 276 (1957). The FTCA is a waiver of sovereign immunity with certain specific limitations. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–2680. The limitations on the FTCA's waiver of sovereign immunity are to be strictly construed. *Sherwood*, 312 U.S. at 590; *see also Childers v. United*

*States*, 442 F.2d 1299, 1303 (5th Cir. 1971) (holding plaintiff's claim barred by the six month period limitation of Title 28 § 2401(b) because the provision is entitled to strict construction and equitable considerations do not extend that period).

B.      Summary Judgment Generally

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986).  A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party. *Newport News Holdings Corp. v. Virtual City Vision*, 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denial of the movant's pleading, but instead must "set forth specific facts" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 252; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249.   "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."  *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

# IV.    ANALYSIS

A.    The Government's Motion to Dismiss

*1. The Parties' Arguments*

The Government moves to dismiss these cases arguing that the court lacks subject matter jurisdiction over them because they are "barred by the FTCA's discretionary[]function exception."[12]    (ECF No. 140-1 at 2.)    To demonstrate the applicability of the discretionary[]function exception, the Government argues that it only has to show that (1) the act at issue "involv[es] an element of judgment or choice" and (2) the judgment or choice "is of the kind that the discretionary function exception was designed to shield."    (*Id.* at 6–7 (quoting *United States v. Gaubert*, 499 U.S. 315, 322–23 (1991)).)    In these related matters, the Government asserts that the conduct challenged by Plaintiffs is twofold: first, is the issue of whether the Government's management at Fort Jackson negligently failed to operate and maintain the Semmes Lake Dam at a SDF of ½ PMF (*see id.* at 8 (citing ECF No. 113 at 10–14)), and second, is the issue of whether the Government negligently failed to conduct mandatory maintenance on the dams.[13]    (*Id.* at 10.)    The court addresses each of these acts below.

**a)  ½ PMF**

The Government asserts that Plaintiffs' cases should be dismissed because they have not cited to any mandatory federal statute, regulation, or policy that required Fort Jackson's management to upgrade the Semmes Lake Dam with a spillway meeting the ½ PMF

---

[12] Even though Plaintiffs' Motion is first-filed, the court must consider the Government's Motion to Dismiss first because application of the discretionary function exception "is a jurisdictional question." *McMellon v. United States*, 395 F. Supp. 2d 422, 427 (S.D. W. Va. 2005).  "In order for this court to hear and decide [] [the] case, the court must first have jurisdiction over the subject matter of the litigation." *Turner v. Cooper*, C/A No. 2:13-cv-02017-JMC, 2013 WL 5587856, at *3 (D.S.C. Oct. 10, 2013) (citing, *e.g.*, *Willy v. Coastal Corp.*, 503 U.S. 131, 136–37 (1992); *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986); *Am. Fire & Cas. Co. v. Finn*, 341 U.S. 6 (1951)).

[13] Plaintiffs do not appear to dispute this recitation of challenged conduct.

specifications urged by Plaintiffs. (ECF No. 140-1 at 8–14.) The Government further asserts that "[c]ourts have consistently held that a federal agency's decisions regarding whether, when, and how to make repairs and modifications to its infrastructure are grounded in policy considerations . . . [and] is susceptible to policy analysis." (*Id.* at 15, 16 (citing *Baum v. United States*, 986 F.2d 716, 722 (4th Cir. 1993) (observing that "design and construction decisions [are] just the kind of planning-level decisions of which the Court spoke in *Gaubert*.")).) As a result, the Government contends that "[t]he discretionary[]function exception bars these actions because Fort Jackson's management of its dam—including specifically, the decisions whether and when to alter the Semmes dam's spillway to increase its capacity—was a matter of judgment and choice for the installation's senior commander." (*See id.* at 15–21.)

Plaintiffs oppose the Government's Motion to Dismiss arguing that "the discretionary function exception does not shield the Government from liability arising out of its employees' negligent conduct." (ECF No. 152 at 5.) In their consideration of the first *Gaubert* element, Plaintiffs observe that the Government's liability "related to Semmes Lake is based on the [] failure to maintain its dam in accordance with the applicable mandatory statutes, regulations, and polices, which included 1) its failure to maintain the Semmes Lake dam at its selected design flow (flood); 2) the Government's addition of the 1 foot high curb across the emergency spillway; and/or 3) the Defendant's failure to maintain the outlet works." (*Id.* at 8.) Plaintiffs assert that the Government's discretion as to the Semmes Lake Dam is expressly removed by (1) AR 420-1 mandating that "[s]ignificant or high hazard dams requiring structural maintenance or repair will be immediately maintained or repaired, breached, or the pool lowered" (ECF No. 152 at 12 (quoting ECF No. 103-3 at 6 § 7-52(b))); and (2) AR 420-72 mandating that "Army dams at all CONUS installations will be maintained at or above the minimum condition levels of host

State and as specified herein and in the above referenced FEMA documents" and "[a]ll dams must be maintained to allow passage of the design flows (flood) without major deterioration of dam components or damaging erosive or undermining action, nor loss of stability."  (ECF No. 152 at 11–12 (quoting ECF No. 103-4 at 5 §§ 5-5, 5-6(a)).)  Based on the aforementioned regulations in combination with other evidence in the record, Plaintiffs contend that the Government was aware that it needed to maintain "[t]he appropriate Spillway Design Flood (SDF) [at the Semmes Lake Dam which] was determined to be 1/2 the PMF."  (*Id.* at 14 (citing ECF No. 103-11 at 9–11).)

As to the second *Gaubert* element, Plaintiffs argue that Fort Jackson's garrison commander's failure to maintain a ½ PMF at the Semmes Lake Dam is not susceptible to policy analysis because "Army Regulation 420-1, section 7-4(b)(5) confirms that '[g]arrison commanders could be held liable for any legal claims, obligations, or liabilities resulting from the failure of a dam, if the commander had not ensured that all legal and safety requirements had been met.'"  (ECF No. 152 at 22 (citing ECF No. 152-5 at 3).)  Based on the foregoing, Plaintiffs argue that "[t]he discretionary function exemption does not apply in this case because 1) mandatory Army regulations required the Defendant to maintain the Semmes Lake Dam and Lower Legion Lake Dam; and/or 2) the negligent actions of the Defendant's employees were not susceptible to policy analysis."  (*Id.* at 8 (citing *Berkovitz v. U.S.*, 486 U.S. 531, 536 (1988) ("The discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.")).)

### b)  Dam Maintenance

In addition to the Government's alleged failure to maintain the Semmes Lake Dam at ½ PMF, Plaintiffs assert that the Government's employees failed to conduct mandated maintenance

on the dam "to control the vegetation on the downstream slope and [] maintain the outlet gate." (ECF No. 113 at 25.) Plaintiffs contend that "DA Pamphlet 420-1-3 provides [the requisite] mandatory directives for the garrison commander for maintenance and testing." (ECF No. 113 at 23.) Plaintiffs identify the following language in DA Pamphlet 420-1-3 as most relevant to this inquiry:

> Earthen dams will have vegetation properly controlled and mowed, seepage will be constantly observed and controlled, and erosion repaired. Spillways will be properly maintained and erosion repaired. Outlets will be maintained and controls tested annually.

(*Id.* at 13 (quoting ECF No. 103-9 at 7 § 6-4).)

In response to Plaintiffs' citation to DA Pamphlet 420-1-3 for mandatory language regarding dam maintenance, the Government argues that the Pamphlet's language is not mandatory because it "is not binding authority, but rather is intended as 'guidance only.'" (ECF No. 140-1 at 10 (citing ECF No. 126-4 at 4).) In support of its position, the Government refers the court to AR 25-30 (effective June 3, 2015), which provides that "procedures established in a DA pamphlet are for guidance only and to establish optional or helpful methods of performing mission and functions, define probable courses of action, and explain how something is affected." (*Id.*) The Government further refers the court to case law from the United States Court of Appeals for the Fourth Circuit in which the Court expressly found that a DA pamphlet (1) is "not included among the list of 'publications that will be used to issue departmental policy'" and (2) fails to "qualify as the sort of 'federal statute, regulation, or policy' which would preclude the application of the discretionary function exception." *Hibble v. United States*, No. 96-2180, 1998 WL 2882, at *1 (4th Cir. Jan. 7, 1998) (citing AR 25-30).

2. *The Court's Review*

"The FTCA excludes discretionary functions from its waiver of sovereign immunity."

*Johnson v. United States*, C/A No.: 5:17-cv-00012, 2018 WL 4169141, at *3 (W.D. Va. Aug. 30, 2018) (citing 28 U.S.C. § 2680(a)).  "This discretionary function exception provides that the sovereign immunity waiver does not apply to: any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* (quoting § 2680(a)).  "The exception exists in order 'to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"  *McMellon v. United States*, 395 F. Supp. 2d at 427 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).  "[T]he exception is an acknowledgment that an agency, charged with the daunting task of administering a government policy or agenda, cannot be expected to create regulations that serve as a blueprint for all conceivable factual situations arising within the scope of its regulatory authority."  *Id.*  "[W]hen necessary, agencies may enact regulations that empower government decision-makers with the authority to make choices or judgments based on the underlying policy goals of the regulatory regime."  *Id.* at 427–28.  "Such decisions are protected from liability by the discretionary function exception [] when the decision-maker, exercising his or her government-created discretion, bases the decision on the policy concerns of the governing regulatory regime."  *Id.* at 428.

"To state a claim under the FTCA, a plaintiff has the burden of stating a claim for a state-law tort and establishing that the discretionary function exception does not apply."  *Spotts v. United States*, 613 F.3d 559, 569 (5th Cir. 2010) (citation omitted).  If the exception does apply,

the court "must dismiss the affected claims for lack of subject matter jurisdiction." *Indem. Ins. Co. of N. Am. v. United States*, 569 F.3d 175, 180 (4th Cir. 2009) (citing *Williams v. United States*, 50 F.3d 299, 304–05 (4th Cir. 1995)). In *Indemnity Insurance*, the United States Court of Appeals for the Fourth Circuit provided the following summary of the test used to determine the applicability of the discretionary function exception:

> "To determine whether conduct by a federal agency or employee fits within the discretionary function exception, we must first decide whether the challenged conduct 'involves an element of judgment or choice.'" *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 100 L.Ed.2d 531 (1988)). "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive."[14] *Berkovitz*, 486 U.S. at 536, 108 S. Ct. 1954.
>
> If we determine that the challenged "conduct does involve such discretionary judgment, then we must determine 'whether that judgment is of the kind that the discretionary function exception was designed to shield,' *i.e.*, whether the challenged action is 'based on considerations of public policy.'" *Suter*, 441 F.3d at 311 (quoting *Berkovitz*, 486 U.S. at 536–37, 108 S. Ct. 1954). Critical to proper analysis, this inquiry focuses "not on the agent's subjective intent in exercising the discretion . . ., but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert*, 499 U.S. 315, 325, 111 S. Ct. 1267, 113 L.Ed.2d 335 (1991). Thus, "in the usual case" a court should "look to the nature of the challenged decision in an objective, or general

---

[14] As to this first element, the *McMellon* court made the following relevant observations:

> "If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert*, 499 U.S. at 316, 111 S. Ct. 1267. Thus, under the first part of the test, where a government agent acts under the authority of a statute, regulation, or agency policy, the court must ask whether that statute, regulation, or policy carves out an area of less rigid regulatory supervision in order to permit the agent to consider regulatory policy in electing the appropriate option, or if the authority mandates a single course of action based on specific, objective terms. If the authority prescribes a course of action in specific and objective terms, and the government actor complies with the regulation, the action is presumed to be in furtherance of the policy of the regulatory regime, the discretionary function exception will not apply, and liability may attach.

*McMellon*, 395 F. Supp. 2d at 428.

> sense, and ask whether that decision is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 721 (4th Cir. 1993). "Moreover, when a statute, regulation, or agency guideline permits a government agent to exercise discretion, 'it must be presumed that the agent's acts are grounded in policy when exercising that discretion.'" *Suter*, 441 F.3d at 311 (quoting *Gaubert*, 499 U.S. at 324, 111 S. Ct. 1267).

*Indem. Ins. Co.*, 569 F.3d at 180.

In these cases, Plaintiffs assert that the Government is liable for their damages because it negligently failed to operate the Semmes Lake Dam with a ½ PMF and failed to conduct required maintenance on both dams at issue in this litigation. "[A] safety or engineering standard operates to remove discretion under the FTCA when it is embodied in a specific and mandatory regulation or statute which creates clear duties incumbent upon the governmental actors." *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1026 (9th Cir. 1989). "A general statutory duty to promote safety . . . would not be sufficient." *Id.* (citing *Allen v. United States*, 816 F.2d 1417, 1421 (10th Cir.1987) (broad and general duty imposed by statute on Atomic Energy Commission to promote safety in atomic testing left room for exercise of discretion)). "[D]iscretion [also] may be removed by a specific mandatory governmental policy duly adopted under authority delegated by statute or regulation." *Id.*

### a) ½ PMF

In considering the applicability of the mandatory standard element of the discretionary function exception as to the failure to operate the Semmes Lake Dam at ½ PMF, Plaintiffs assert that the Government's conduct could not have involved an element of choice because action was mandated by Army Regulations. (ECF No. 152 at 8.) Moreover, Plaintiffs contend that, due to the language in the Army Regulations that suggests an adherence to state regulations, the Government was also mandated to follow DHEC regulations. (*Id.* at 11.) The relevant language contained in Army Regulation ("AR") 420-72 specifies that Army dams "must be maintained *at*

*or above* the minimum condition levels of [the] host State . . ." (emphasis added). (ECF No. 103-4 at 5 § 5-5.) While the court agrees that AR 420-72 instructs the garrison commander to reference state law requirements, the addition of "at or above" in the regulation implies that the garrison commander has a level of discretion. Semmes Lake Dam, at the time of the flood, was classified as a significant hazard dam. (ECF Nos. 103-12 at 11, 140-1 at 13.) Under South Carolina Regulations, a dam owner must maintain their spillway-capacity design inside the applicable Table 1 range. *See* S.C. Code Ann. Regs. 72, Table I. However, if the owner can justify the design to DHEC's satisfaction, the spillway-capacity can fall outside of the applicable table range. *Id.* Therefore, the South Carolina Regulations, similar to AR 420-72, contain an implied element of discretion. The ability to choose any level contained in the applicable Table 1 range offers dam owners, and in this situation the garrison commander, a level of discretion.[15]

In addition to the aforementioned, there is not a federal statute, regulation, or policy that specifically prescribes a PMF of ½ for the Semmes Lake Dam. *E.g.*, *Baum*, 986 F.2d at 720 ("The inquiry boils down to whether the government conduct is the subject of any mandatory federal statute, regulation, or policy prescribing a specific course of action."). ARs 420-1 and 420-72 do not impose a course of conduct so specific as to require the ½ PMF asserted by Plaintiffs. *E.g.*, *Fanoele v. United States*, 975 F. Supp. 1394, 1398–99 (D. Kan. 1997) ("[O]nly if a 'specific and mandatory regulation, statute or policy requires a particular course of action' will a government employee's conduct not fall within the discretionary function exception.") (citation omitted). These Army Regulations leave the final decision responsibility for any flood

---

[15] The court observes that its finding regarding the garrison commander's discretion obviates any factual dispute created by Plaintiffs' expert's opinion that "South Carolina DHEC Regulation 72-3-D-2-a-9 states that the inflow design flood should be in the range ½ PMF to PMF for a Small High Hazard Dam . . . [t]hus, in my opinion an inflow design flood of ½ PMF would be the minimum acceptable inflow design flood for Semmes Lake Dam at the time of the rehabilitation in 2006 to 2008." (ECF No. 126-6 at 2.)

and risk analysis to the discretion of the garrison commander. (*See, e.g.*, ECF No. 103-3 at 5 § 7-47(c).) In actuality, the only "federal" documents in the record that reference ½ PMF are the 1997 and 2010 EAPs. However, after consideration of the entirety of the record and after review of additional online sources, the court cannot conclude that an EAP constrains the dam owner's actions "in such a way that he had no discretion but to act only a certain way." *PNC Nat'l Ass'n v. U.S. Army Corps of Eng'rs*, Case No. 2:13-CV-374 JVB, 2018 WL 1531790, at *3 (N.D. Ind. Mar. 29, 2018).

"An EAP is prepared by the owner/operator of a dam or levee project stressing the actions to take to moderate or alleviate the emergency." *Guidance for Emergency Action Plans, Incident Management and Reporting, and Inundation Maps for Dams and Levee Systems*, https://www.publications.usace.army.mil/LinkClick.aspx?fileticket=wPpTpqGfUYQ%3D&tabid =16426&portalid=76&mid=31387 (last visited Sept. 25, 2018); *see also* ECF No. 103-9 at 8 § 6-5(b) ("A garrison commander is responsible for preparing a plan covering these measures and listings actions that the owner and operating personnel *should take*." (emphasis added)). "The EAP contains procedures and information to assist the project owner/operator in issuing early warning and notification messages." *Id.* "[E]very EAP must be tailored to site-specific conditions and *should remain simple enough to encourage use*." *Id.* (emphasis added). "Each EAP must include information to help guide the project owner/operator in making immediate operational decisions for a range of emergencies relevant to the project." *Id.* "EAP's are essential because they identify the area below the dam that would be flooded from a failure, establish the communication between the dam owner and emergency response personnel, provide for notification and evacuations conducted by police, fire, and rescue teams, and predict the timing of the dambreak floodwave." *Emergency Action Planning for State Regulated High-*

*Hazard Potential Dams*, damsafety.org/sites/default/files/ files/608_EAP_07.pdf+&cd=12&hl =en&ct=clnk&gl=us&client=firefox-b-1-ab (last visited Sept. 25, 2018).

Upon the court's review, EAPs appear to provide general directives for the purpose of dealing with dam safety emergencies "to prevent the loss of life and/or property" (*see, e.g.*, ECF No. 103-11 at 5(e)), but allow the dam's owner to maintain his or her broad discretion. Therefore, the court finds that neither the EAPs nor any other "federal" statute, regulation, or policy in the record mandate a ½ PMF. Accordingly, the decision to operate and/or maintain the Semmes Lake Dam at a specified PMF involved an element of judgment or choice.

### b) Dam Maintenance

Plaintiffs claim that the Government failed to conduct required maintenance on the Semmes Lake Dam and the Lower Legion Lake Dam. In their filings, Plaintiffs rely heavily on DA Pamphlet 420-1-3 to support their position regarding the existence of mandatory federal law regarding dam maintenance. However, based on the law cited by the Government, it is clear to the court that DA Pamphlet 420-1-3 cannot serve as mandatory federal law specifically prescribing a course of action as it relates to dam maintenance. In this regard, without DA Pamphlet 420-1-3, Plaintiffs fail to carry their burden of persuading the court that there are federal statutes, regulations, or policies that specifically govern dam maintenance thereby removing the element of judgment or choice from the Government's actions.[16]

---

[16] The court further observes that even though DA Pamphlet 420-1-3 uses the word "will," this usage does not necessitate a finding that the language is mandatory since the Pamphlet contains other discretionary language. *See Slappey v. United States*, No. 1:11-cv-93 (WLS), 2013 WL 5406431, at *6 (M.D. Ga. Sept. 25, 2013) ("As to requirements for maintenance, . . . the word 'shall' is not dispositive where, like here, a regulation contains other discretionary language." (citing *Ochran v. United States*, 117 F.3d 495, 500 (11th Cir. 1997) (noting that the word "shall" in U.S. Attorney General Guidelines did not remove discretion because it did not specify how to take a particular course of action); *Powers v. United States*, 996 F.2d 1121, 1125 (11th Cir. 1993) (applying discretionary function exception when statute provided that director of FEMA "shall from time to time take such action as may be necessary" )).)

### c) Public Policy Considerations

As to the public policy analysis element of the discretionary function exception, the court observes that Plaintiffs' arguments do not demonstrate that the Government's failure to either operate the Semmes Lake Dam with a ½ PMF or conduct specified maintenance on the Semmes Lake Dam and/or the Lower Legion Lake Dam was a decision made outside of the scope of policy-driven duties. *See A.O. Smith Corp. v. United States*, 774 F.3d 359, 365 (6th Cir. 2014) ("There is a 'strong presumption' that the second part of this *Gaubert* test is satisfied if a court concludes that the employee was exercising discretion." (citing *Gaubert*, 499 U.S. at 324)). "Judicial intervention in such decisionmaking through private tort suits would require the courts to 'secondguess' the political, social, and economic judgments of an agency exercising its regulatory function." *Hawes v. United States*, 322 F. Supp. 2d 638, 645 (E.D. Va. 2004) (citation omitted). "It was precisely this sort of judicial intervention in policy-making that the discretionary function exception was designed to prevent." *Id.* at 645–46.

Therefore, upon consideration of the foregoing, the court finds that the Government's alleged negligent conduct falls within the discretionary function exception and does not form a proper basis for a lawsuit under the FTCA. Accordingly, the court finds that it lacks subject matter jurisdiction over these actions and must dismiss them.

## V.    CONCLUSION

For the reasons stated above, the court finds that the conduct challenged in these related cases falls under the discretionary function exception of the FTCA and is barred by sovereign immunity. Accordingly, the court **GRANTS** the Government's Motion to Dismiss (ECF No. 140 (*Cohen*); ECF No. 82 (*Brown*); ECF No. 73 (*KGOAI*)), **DISMISSES** the Complaints in these related actions (ECF No. 48 (*Cohen*); ECF No. 1 (*Brown*); ECF No. 1 (*KGOAI*)) without

prejudice,[17] and **FINDS** that it is without jurisdiction to review the merits of Plaintiffs' Motion for Summary Judgment and the Government's Motion for Summary Judgment.[18]   (ECF Nos. 103, 140 (*Cohen*); ECF Nos. 46, 82 (*Brown*); ECF Nos. 56, 73 (*KGOAI*).)

      **IT IS SO ORDERED.**

                         *J. Michelle Childs*
                         United States District Judge

September 27, 2018
Columbia, South Carolina

---

[17] Granting a party's 12(b)(1) motion to dismiss does not constitute a judgment on the merits, and is therefore without claim preclusive or res judicata effect.  *Farquhur v. United States*, C/A No. 1:07cv1033, 2007 WL 4233492, at *2 (E.D. Va. Nov. 28, 2007) (citing *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995)).

[18] The court observes that Plaintiffs assert that their claims in *Cohen* for nuisance and trespass are not subject to dismissal pursuant to the discretionary function exception.  (ECF No. 152 at 5 n.4)  The court disagrees and finds that these claims are also subject to dismissal by way of the discretionary function exception.  *See Burrows v. United States*, No. 04-1242, 2005 WL 152427, at *1 (4th Cir. Jan. 25, 2005) (affirming the district court's finding that Appellants' "trespass and nuisance claims were barred by the discretionary function exception to the FTCA's waiver of sovereign immunity"); *In re Tenn. Valley Auth. Ash Spill Litig.*, 787 F. Supp. 2d 703, 724–25 (E.D. Tenn. 2011) ("[I]n light of the above authority and the lack of authority on the inapplicability of the discretionary function doctrine to private nuisance claims, the Court agrees with TVA that the discretionary function doctrine, if applicable, does indeed preclude private nuisance claims. ") (listing cases).